Zembrod v. The State.

*J. F. Warren,* for the appellee Chilton.

---

JOSEPH ZEMBROD v. THE STATE.

Where the guilt of a party charged with a capital offence depends upon the issue of his sanity or insanity at the time of the commission of the imputed crime, if the testimony upon the subject of his insanity is of a character to induce the belief that it is not a case in which the "proof is evident or presumption great," he is, after indictment found, entitled to bail.

See the facts of this case touching the prisoner's insanity, where the court held that bail should be allowed.

APPEAL on *habeas corpus.* Tried in vacation before the Hon. C. A. Frazer.

Joseph Zembrod killed George Dellardt at the market house of the latter, about daylight on the morning of the 13th day of Febraury, 1860. He was immediately arrested, and was admitted to bail by the justice of the peace in the sum of twenty thousand dollars; and failing to give the bond, was committed to jail. At the ensuing term of the District Court for Harrison county, he was indicted and charged with murder in the first degree. At said term of the District Court, the accused, on the 26th day of March, 1860, was arraigned, pleaded "not guilty," and was recommitted to jail by order of the court without any examination being then had concerning the case.

On the 24th day of April, 1860, he applied to the Hon. Chas. A. Frazer, district judge, for a writ of *habeas corpus*, which was granted. The petition alleges that he is not guilty of the crime of murder; and that in view of the facts tending to show his guilt or innocence, and of his ability to give bail, the bail demanded of him by the justice was excessive; that the petitioner is a foreigner not long resident in the United States, poor, and with no relatives to aid him; and prays for a discharge from custody, or a reduction of the bail to a less sum than that required by the justice, accordingly as the law and the facts of the case may demand.

William Lister testified that on the morning of February 13th, 1860, before it was fairly light, as he was going across the square towards the market house of George Dellardt, he saw the prisoner step in at the west door of said market house—he was a few feet ahead of the witness when he entered—saw something in the prisoner's hand which he supposed to be a stick. That he saw the prisoner present the pistol in the direction of the deceased and fire—saw fire on the left arm of the deceased as the pistol exploded. The witness ran out of the house and heard the deceased halloo. The prisoner followed witness close behind to the pavement a short distance, turned and came up to him and enquired where he would find the mayor. He referred him to some men standing at a corner; the prisoner went on in that direction. The deceased was shot sitting in a chair behind his counter and near a desk. At the discharge of the pistol the deceased threw up his

arms; witness heard no words pass between the parties, and saw nothing in the hands of the deceased; though if there had been anything in his hands he probably could not have seen it, on account of a candle [a lighted candle it is presumed—REP.,] between witness and the deceased. As soon as the pistol fired, the deceased rose, went around the counter, came to the front door, and attempted to sit down, but before he steadied himself rolled off on the pavement, where he remained some time. Witness afterwards, returning to the spot, found him dead.

Wm. Russell testified that, being attracted by the discharge of the pistol, and seeing two men run out of the market house, he ran there and found the deceased lying on his face on the pavement, dead, as he supposed. He pursued the prisoner; overtook him on the street leading to the residence of the mayor of the city of Marshall. The prisoner on being hailed by him, stopped, turned round, and may have made a few steps back towards the the witness; having in his hand a pistol, and then said he wished to give himself up. He gave himself up and returned without resistance.

C. W. Slater testified that when he took the prisoner into his custody the prisoner had a pistol, the barrel of which was about twelve inches in length, with the cock on the under side; the weapon was not loaded.

Charles Henrich testified that the accused came to his house (the store house of Henrich & Muntz,) on Sunday night, (the night preceding the homicide,) and went up stairs to do some writing for witness; they subsequently came down, and about a quarter of an hour afterwards, Mr. McFall and Mr. Dellardt came in. Witness, Zembrod, and the deceased drank together of a bottle of brandy set out to them. The accused drank two or three times, and mixed water with the brandy. Witness thought accused remained about an hour and a half at his house, and left about ten o'clock. Thought the accused was not drunk, but was excited from conversation—the subject was politics. The bottle used held a pint, or a little more.

R. B. McFall testified that, on the occasion referred to by the last witness, the deceased, the accused, and himself drank nearly

a bottle of liquor, containing about the fifth of a gallon, in an hour and a quarter. Witness thinks the accused drank as many as five times while they were together; and that Dellardt drank two or three times. Witness himself had drank several times during the day, as well as on that occasion, but was perfectly cool, and was not intoxicated. When witness separated from the accused after leaving the store, he supposed him to be excited from the effect of the liquor he had drank. · He stated also that Zembrod and the deceased had some words in German which he did not understand—they were talking loud, and witness remonstrated with them against making so much noise. They walked behind witness all the way from Henrich & Muntz's gate; reaching the residence of Mr. Hynson, there bursted forth shouts from said parties, followed immediately by blows. Witness at once went back and separated them, telling Dellardt to go away and let Zembrod alone. The latter remarked to the witness that he had lost his hat; witness looked for it, but could not find it; when Dellardt remarked, "here is the damned scoundrel's hat," picked it up and handed it to the one or the other of them, but is not certain which. Zembrod returned by the same street he had come, and witness saw no more of him that night. Witness said "he did not see anything wrong as regards the defendant's mind while he was with him; —had been acquainted with him some time."

The witness Malhousen is the only other person who saw the accused afterwards, until the fatal rencontre on the succeeding morning; whose testimony is fully and correctly stated in the argument of the counsel for the appellant, and to which reference is made.

F. S. Bass testified that he became acquainted with Zembrod in July 1858. That "on the 7th September Mr. Ezell employed him as instructor in modern languages—was connected with him one entire session. During that time, so far as his mental constitution was concerned, he considered him perfectly right. Defendant was certainly one of the finest linguists he ever saw. Never saw defendant in any of his fits of mental derangement." The witness engaged the defendant to teach Latin and Greek, and a

French class. Has had occasion to see him every morning for about three weeks, and at the morning recess, about 10 o'clock, for fifteen minutes, which was prior to the commission of the homicide.

The witness had no recollection of having seen the accused during the three days preceding the commission of the homicide. Witness expressed the opinion that Zembrod was a good Latin and French scholar, that he taught the Hebrew, and by repute was also a good Greek scholar—that " he was one of the finest historians he ever knew, but had not much mind for mathematics, and did not profess to teach that branch of science ;—devoted himself to polite literature." Witness had never boarded with the accused, except during two weeks, when he took his meals at Mr. Ezell's ; was not intimate with him; saw him only at the college; and knew nothing of his knowledge of moral science. "He was," said the witness, " a gentleman who had devoted his life to literature. I considered him deficient in common sense."

C. W. Slater, the officer who arrested the prisoner, testified further, as follows: "As far as I could judge from the prisoner's action at the time of the arrest, I thought him to be a little drinking; I did not see any indications of insanity in the prisoner. His actions whilst in my custody, were those of a rational man." Cross-examined, the witness said he took the prisoner into custody about sun up, at the request of Mr. Russell, from whom he received him. The witness asked him to go with him ; he took him to jail, and was not looking to discover whether he was insane or not.

The testimony principally bearing upon the prisoner's mental condition is well collected and digested in the argument of the counsel for the appellant before referred to. The testimony of Mrs. Means, James E. Wallace, William Lester, E. J. Beall, Wm. Russell, Wm. Malhousen, George Smith, Dr. Joseph Taylor, Dr. R. W. Poe, C. W. Slater, R. B. McFall and Charles Henrich was taken before the justice in the examination for commitment, and on the hearing of the *habeas corpus*, was, by agreement, received and used as evidence. The testimony of all the other witnesses, (together with some in addition to that originally given by

McFall and. Slater, elicted by a re-examination of them,) was given on the trial on the hearing of the writ of *habeas corpus*.

A letter from the prisoner to Dr. Joseph Taylor was also in evidence, dated· at Shreveport, September 10th, 1859. It acknowledged the receipt of a letter from Dr. T. during the spring previous, and stated that at that time he was engaged as teacher in the neighborhood of Shreveport. The writer complained of having been discharged after one month's faithful service, on the plea of his incapacity to instruct little children, receiving besides his pay a good certificate, for which he "did not care a farthing," and said, "the real reason was the pious boors had engaged the Rev. Chapman of the fashion and its consequences as gospel roarer and pedagogue." That he was then "mad with the world; and had since written little or nothing at all,—not even to his parents." After that time said he "I tried my fortune again in Shreveport; in consequence of which I have plunged deeper into poverty, debts and damnation, than I did in Marshall. Though several offers had been made to ·me since, I have rejected them with disdain and perfect loth. I am now deputy postmaster, dealing out letters to niggers, grisettes, fools, lawyers and gentlemen, if such beings exist besides in dictionaries under the letter ' G.' I have been sported with, Doctor—I have been betrayed and fooled by more than one who professed to be my friend. As a scholar and a man who has a deep feeling for friendship when once entered, you may imagine that my grief must be great. In my youth I had never to do with bad, indifferent men; and as a spoiled child had no knowledge of the world until now. Here I stay now, troubled by my creditors, ridiculed by enemies, treated with indifference by my alleged friends, and there is no friendly hand that would guide ·me out of this chaos of misfortune. The only thing that I am wanting is a proper employment, occupation, and some emolument, as God has not blessed me with other earthly goods, besides some knowledge to help myself through the world. Doctor, you are the only man that could anticipate, and to whom I might confide the .secret of my sad situation; yet let us pass over it—it is my own fault; I have once deviated from a wholesome prejudice, and given way to passions. The rest of my life

will probably remain a continued strain of wretchedness and re-morse. I repent very much having left Marshall; not that I think I could have made a fortune there, yet I might have gone somewhere else. Now to you I will say, what I would not do here, because it would avail nothing. I am not satisfied with this new occupation of mine. It is true, constant occupation gives some tranquillity to my mind, and keeps me from dreaming; yet I cannot long stay there. I have fallen from a considerable height; I have entered this situation in a moment of disgust and distrust with everybody around me, yet I could not do better; for all power and energy in myself were lost. Now my dear friend, could you perhaps give me a friendly advice? Are you still willing to make the same offer to me as you did in April last? I should like to go to Texas again, as fresh and self-possessed as when I came last year—taking more heed of myself—ready to begin a new life. If you can do something for me, do it; yet I would prefer to be somewhat removed from Marshall. Please give me an answer; tell me that I have at least one friend left.

"With best respects to your family,

"Your unhappy friend,

"JOSEPH ZEMBROD."

The district judge recommitted the prisoner to the jail, and ordered that he be there safely kept to await his trial on the indictment against him; from which judgment this appeal was taken by the prisoner.

*D. S. Jennings* and *John Burke*, for the appellant.—On the trial of the *habeas corpus*, the evidence which was taken before the examining court was, by consent, read to the district judge, besides which other evidence was adduced in behalf of the State and of the accused. It was urged before the district judge, and is insisted in this court that the defendant, when he committed the homicide, was insane. The mental capacity of the accused is the sole ground upon which we rely for a reversal of the decision of the district judge. We are aware that the plea of insanity, especially in cases in which its existence was not even suspected by the community generally in which the outrage was

committed, and in which the accused · resided and was known, is apt to be regarded with suspicion, distrust, incredulity. Testimony conducing to prove its existence, of a character most overwhelmingly conclusive, fails to have its due weight. Theories are resorted to, to explain away its force, neither consistent with the facts of the case, with medical jurisprudence, nor with sound logic. In saying this, we simply speak of that which we have seen, meaning not the slightest disrespect to any one. Indeed, we think we are offering the best apology which could well be adduced for the decision which was made upon the facts contained in the record in this case. This may be a mental hallucination of ours. If so, it has come upon us very gradually, after a most deliberate consideration of the testimony, and a most careful application of the tests which medical jurisprudence furnishes to aid in determining the existence of insanity. We think that the opinions of the physicians and others who testified to the insanity of the accused, were decisive of the application for bail, had the state of the facts rendered a resort to them necessary. That the opinions of medical men founded either upon their personal knowledge of the accused, upon a supposed state of facts, or upon the evidence given on the trial, or upon all these taken together, is admissible in evidence, is well settled by American adjudications. (See Wharton & Stille's Med. Jurisprudence, § 94, p. 76.) Note where it is said that, "In this country the present practice, when medical men are examined as experts, is to ask their opinion as to a hypothetical state of facts. If they happen to have been present during the whole trial, they may be asked their opinion as to the particular facts, supposing them to be true." The general rule laid down by Phillips (1 Phil on Ev., 290; 2 Parker's Crim. Rep., 134) is, "The opinion of medical men is evidence as to the state of a patient whom they have seen. Even in cases where they have not seen the patient, but have heard the symptoms and particulars of his case described by other witnesses at the trial, their opinion on the nature of such symptoms has been properly admitted. Thus, on a question of sanity medical men have been permitted to form their judgment upon the representation which witnesses upon the trial have given of the conduct, manner and

general appearance exhibited by the patient." In the case of Rex
v. Searle, (1 Moo. & Ry., 75; 2 Park. Crim. Rep.,) it was held :
" That a medical man, who had heard the trial, may be asked
whether the facts proved show symptoms of insanity." Mr.
Chitty, in his Treatise on Medical Juprisprudence, p. 356, Park.
Crim. Rep., 135, lays down the rule thus : "The opinion of
medical witnesses, who have seen the alleged lunatic, is unques-
tionably admissible, and although they have not seen the lunatic,
yet their opinion, after hearing all the evidence, whether or not a
person having so acted, and evinced such delusions, ought to be
deemed a lunatic, it seems is admissible. In Wright's case, (Russ
& Ry., 456 ; Ros. Crim. Ev., 179,) the judges allowed a medical
man, who had heard the trial, to be asked whether, from the other
testimony given in the case, the act with which the prisoner was
charged was, in his opinion, an act of insanity. Upon the au-
thority of the above case, Park, justice, allowed a medical man,
who had heard the trial, to be asked whether the facts and ap-
pearances proved showed symptoms of insanity. (Roscoe Crim.
Ev., Title, Witness.)

In conclusion of this branch of our subject, we beg leave again
to quote from Wharton & Stille, remarking that the first sentence
of the paragraph does not apply to the point under discussion,
though, for an obvious reason, necessary to be embraced in our
extract. It will be found at page 45, § 57, and is in these words :
" The great weight of American judicial authority therefore in-
clines to the recognition of homicidal insanity as a distinct basis
of defence. And, in fact, this concession is but a legitimate con-
sequence of the position already generally noticed, and to be
presently more specifically considered, that the testimony of medi-
cal men is, on medical questions, to be received by the court and
jury as authoritative."

The next question which presents itself for our consideration
regards the weight of the opinions of medical men, when received,
with the court or jury, and especially as to the weight to which the
opinions of the four medical men, who testified in this case, was en-
titled with the district judge in determining the question of bail. It
is a maxim of the common law, "Cuilibet in sua arte pereto est cre-

*dendum.*" (Co. Lit., 125; rendered, every man is to be con-sidered skillful in his own profession.) (Branch's Principia, 32.) Dr. Winslow, in his Treatise on Insanity, says: "The judge and jury, never having had opportunities of studying the diseases of the mind, must depend principally upon the evidence of medi-cal men. If they, too, have not investigated the subject, how perilous is the position of the unhappy man who is charged with the commission of a capital crime." The court judicially know, and if they do not, the testimony of Dr. Avery discloses the fact that the symptoms and treatment of mental disease is a part of the education of every regular physician. We concede that, in the knowledge of the symptoms and in the treatment of mental as well as in physical disease, different degrees of skill are evinced by different physicians. In the treatment of disease, either mental or bodily, great skill is the result of much practice; but, in judg-ing of the symptoms, a man can attain to great skill by avail-ing himself of the observations of others. According to the maxim which we have quoted, every educated physician is to be deemed more skillful than the generality of mankind on subjects falling within the range of his profession; even though he may never have administered a pill or felt a pulse, as the opinion of a well read lawyer, though he may never have appeared in a court of justice, is entitled to more credence than that of a man who never opened a law book. We are combatting the position which has been assumed, and may be again, that the opinion of no medical man is worthy of consideration unless he be shown to be convers-ant with the disease of insanity in practice as well as in theory. If this position be sound, there are but few physicians in the Union, (probably not one in Texas,) whose opinions would be en-titled to any weight with a jury or a judge in deciding upon a question of insanity. They are only to be found connected with lunatic asylums. We think we have demonstrated that the opin-ions of the four physicians were entitled to some weight. In our endeavor to ascertain to what weight, let us look to the transcript. It is to be regretted that Dr. Taylor was not questioned as to his graduation, the length of time he had been engaged in practice, &c. But it is to be presumed that if the force of his testimony

could have been lessened by questions on those subjects, they would have been propounded in behalf of the State. He testified that he was acquainted with the accused, knew him well, that he had boarded in his family. It appears elsewhere in the transcript that the defendant corresponded with Dr. Taylor as with an intimate friend. Dr. Taylor says that, supposing the evidence to be true, and, from his knowledge of the defendant, he believed the act for which the prisoner was on trial was done from an insane impulse without the control of the will. In reply to a question by the examining court, the doctor said : "I have seen the prisoner on two occasions when I do not believe he would have been conscious of doing right or wrong had he killed a man. At one time I felt almost certain that he had not been drinking. The other time I do not know whether he was drinking or not."

Dr. Poe, a graduate of the University of Pennsylvania, and of a homeopathic university, testified that he had known the accused since December, 1858, a part of which time he had boarded with him at the house of Dr. Joseph Taylor. He testified that from his knowledge of the defendant, and from the evidence given in the case, that the defendant was laboring under temporary insanity at the time of the killing of George Dellardt, the deceased. He further stated, that from his knowledge of the prisoner and the evidence, he believed that the defendant committed the act under an insane impulse, without the control of the will. It will be borne in mind that the opinions of doctors Taylor and Poe are based upon their personal knowledge of the accused, and the testimony of the witnesses before the examining court. They had not seen the testimony of Messrs. Bayless Taylor, Lang, Burcher, Sloan, Wallace, and Mrs Means. Dr. Avery, a graduate of the University of Pennsylvania, who had also pursued his studies in Paris, having read the testimony in the case touching the insanity of the defendant, was of opinion that the defendant was irresponsible at the time he committed the homicide on Dellardt, taking the testimony of the witnesses to be true. He thought he was irresponsible " because he was insane, assuming the evidence to be true." He would call his insanity, moral insanity proceeding from disease of the brain. Dr. Sloan, a graduate of South Caro-

34Y

lina Medical College, who had been engaged in the practice of his profession since 1847, "having read the testimony of the witnesses touching the insanity of the defendant, and assuming the facts to be true, and from his previous knowledge of the defendant, was of opinion that he was not morally responsible for what he did at the time of the commission of the homicide, because he did not believe he was in a sane state of mind. He had seen him excited on one subject, and at the same time he was uncontrollable on any subject. He thought that Zembrod was a monomaniac." Had doctors Taylor, Poe and Sloan not been medical men at all, their intimate relations with the accused would have entitled their opinions to consideration.

We will next proceed to show, that on a question of insanity witnesses other than professional men, may state their opinion in connection with the facts on which it is founded. In Connecticut this species of testimony was admitted. (Grant v. Thompson, 4 Conn. Rep., 208.) Judge Swift, in his Treatise on Evidence, p. 111, treats sanity as an exception to the general rule, because "the testimony of witnesses on this subject will generally be in the shape of an opinion, but, says he, they must detail the facts." The verdict of the jury itself is but the opinion of non-professional men, formed upon the facts and science disclosed, and learned at the trial. (Clark v. State of Ohio, 12 Ohio Rep., 488.) In New Jersey, on the trial of Mercer for the murder of Heberton, the same species of evidence was admitted on argument. On the trial of Gardner for the murder of Maria Buel, insanity was set up as a defence, and several of his neighbors testified that they did not consider him insane. Wright's Rep., 398, vide also 12 Ohio Rep., 483, where the point is discussed, the authorities cited, and such testimony decided to be admissible. In North Carolina it was decided, that "a witness who had opportunities of knowing and observing a person whose sanity is impeached, may not only depose to the facts he knows, but may also give his opinion or belief as to his sanity or insanity. (Clary v. Clary, 2 Iredell's Law Rep., 78.) This case is cited and approved in the case of Potts and others v. House, 6 Georgia Rep., 324, and in the case of Norris v. The State, 16 Alabama Rep., new series,

p. 776, in which the judgment of the court below was reversed upon the sole ground of its rejection of testimony of this description. The opinion of the court as condensed in the syllabus, is in these words : " Where insanity is set up as a defence to a criminal prosecution, it is competent for a witness, whose intimacy with the prisoner and opportunities for observation have been such as to enable him to form a correct judgment of his mental condition, not only to depose to facts, but to give his opinion as to whether he was sane or not at the time of the commission of the offence." In 7 Barb., 314, Culver v. Halsam, the court say : " That in a question of mental capacity, the opinion of an intimate acquaintance, not a medical man, is competent when connected with facts and circumstances within his knowledge and disclosed by him in his testimony as the foundation of his opinion." In delivering the opinion of the court in the case of Gibson v. Gibson, 9 Yerger, 332, Judge Reese says : " But having stated the appearance, conduct, or conversation of the testator, or other particular fact from which the state of mind may be inferred, they (unprofessional witnesses) are at liberty to state their inference, conclusion, or opinion as the result of those facts." The propriety of doing this arises from the delicate nature of all investigations into the state of the human mind. How can a witness describe the dissociated and flighty conversation of a lunatic ; the fear, the horror, the frenzy of his eye ; how communicate the influences which mind practices upon mind, if he must not speak of influences, impressions, or conclusions ? " In this country the preponderating opinion is that witnesses, though not experts, who have had from time to time the opportunity of observing the patient, may be asked their opinion as to his sanity." (Whart. Crim. Law, § 48.)

We will now call the attention of the court to the impressions made upon the minds of the unprofessional witnesses touching the insanity of the accused, and the facts upon which those impressions were predicated, that the court may be better enabled to determine to what weight they are entitled. Malhousen, who had known the accused for three years, and at the time of, and for four nights preceding the homicide, occupied the same bed with him, and had for two months immediately preceding the homicide

boarded at the same house with him, stated that the accused came into his room between 10 and 11 o'clock on the night of the 12th of February. His eye was bruised and he had blood on his face; that his conversation was not rational or reasonable; that he did not sleep during the night; kept lying down and getting up and going to the window during the night; did not call witness by his proper name—called him Charley; tore his clothes off instead of pulling them off in the usual way; talked to himself during the night; witness could not understand what he said; he got up in the morning and ran about the room, looking for his clothes; found them and put some of them on, and then took hold of the door and forced it open without unlocking it. His manner was unnatural; he acted like a crazy man; does not believe he knew what he was about: was under great excitement and nervousness, which conduct made witness afraid; that he was wild and he feared he would do something to him; he watched him and did not sleep any; that he continued in this wild state all night and left about day break. He said that he thought the prisoner crazy. Before the accused left the room he said: "They are all after me; they are trying to kill me; I will be a murderer."

George Smith testifies that he had known the accused for four years; that they slept together part of the time while they staid at Lang's; that he was well acquainted with accused's habits and actions; saw him between 10 and 11 o'clock on the night of the 12th of February; he came to the room of witness, at Lang's shop; appeared perfectly wild when he first came; he looked quite strange to witness; did not look like a man in his right mind; rushed about to get the lantern, as if some persons were after him. Witness did not think he knew what he was about while he was in his room, he did not think that he knew right from wrong while he was in the room; witness' reasons for believing accused did not know right from wrong, was from his wild actions in rushing about the room, and his conduct with the lantern, and because he did not do as he had done before.

F. Bercher testifies, that he has known the defendant five or six years; has been on terms of personal intimacy with him; that the first year he came to Marshall he and Mr. Lang were painting

a house for me.   One morning, when the defendant was working by himself, Mr. Lang came in the house where he was, and made a remark to the defendant that he did not put the paint on right on the ceiling.   That as soon as Mr. Lang said this, defendant jumped down from the trussle, thrust both of his hands in the paint keg, and painted his coat all over.   This was the only coat the defendant had.   This occurred soon after breakfast, about 9 or 10 o'clock.   Either in the Spring of 1855 or 1856, he was making a garden for my wife, and he tore off his shirt in her presence.   She sent for me to see what was the matter with the defendant.   I asked him what was the matter.   He said it was too hot for him, he could not hold out any longer.   He did not have any handkerchief.   I saw him at another time tear his umbrella all to pieces and kick his hat around the room.   These acts made the impression on my mind that there was something wrong about defendant.   Defendant was intimate at my house.   It was not from the fact of his painting his coat, but putting all the facts together that I came to the conclusion that defendant was not sane.   From observing all his deportment subsequent to the painting of his coat that I came to this conclusion.   It was about one year ago since he tore his umbrella.

Magdalene Zembrod, sister of the accused, testified in substance as follows :   " That he took a prominent part in the revolutionary struggle in Germany with the liberal party, in the years 1848 and 1849.   That upon the defeat of that party he was incarcerated in the castle of Rastadt, where he remained for three months under sentence of death, and expecting or fearing every time the officer came round that it was to conduct him out to be shot.   Whilst he was thus confined the physician refused to permit her to see him, giving as his reason that accused's skull had been fractured by a blow from a gun, and that he was too badly off for any one to see him.   After his liberation she found a change in him; he was easily excited about trifles.   She gave an instance.   He was engaged as a private teacher in the house of a lord.   His employer told him if he continued to be excited he would render himself liable to be put back into the prison of Rastadt.   When he was told this he went out on the ruins of the castle of Heidleburg,

jumped down, and was unconscious for eight or nine days; was injured on his head; was more excitable than before. His father noticed the change in him. He was restive, uneasy and could not stay long in a place; had some slight recollection of a threat to put him in the lunatic asylum, but could not say whether he left the country on that account. He was sick and badly treated whilst in the castle of Rastadt."

Frederick Gurlinger testified as follows: "I have known the defendant two years. He came over from Mrs. Means' in Louisiana. He invited me to his room. Mr. Dietrich was there with me. Defendant told us the candle was burning, we could read, and he went to bed. He was complaining of boils. I struck him on the back; he broke after us; he did not find us. After awhile I heard something throwing out of the window. He threw his pitcher and wash-stand out, and everything he could get hold of. I went up and stopped him. When I got back to his room he asked me what I went away for; I told him I was afraid he would whip me. I asked defendant what he meant. He said somebody was trying to whip him. That he had run after them with a big stick; showed it to me, it was a large one. He told me I had to stay with him until morning. I put him to bed; stayed with him a half hour. He went to sleep and I left. This happened about two years ago next August."

F. Lang testified: "When the defendant was disappointed by Col. Alford in getting employment as a teacher in his family, he came to his supper at my house; sat down as if to eat his supper; sat awhile, got up, went off, returned to the table again as if to eat his supper, sat a while, left the table, went ont of the room, and again returned. He ate a little the first time, a little the second time, but I was so busily engaged thinking of the defendant's strange conduct that I did not observe whether he ate anything the third time. After painting himself as alluded to in Mr. Bercher's testimony, I followed him, being impressed with the belief that he was not in his right mind, and saw him tear his clothes off himself. The scene at the supper-table occurred some time this year, before the killing."

J. B. E. Taylor testified as follows: "I have known the de-

fendant since 1855. He lived at my house as a teacher a portion of 1855 and 1856. I continued to have social intercourse with him down to the present time. I have seen the defendant under great excitement, I thought, for trifling causes, I thought his mind could not be well balanced from his manner of acting. By not well balanced I mean not right or sound at times. These manifestations were irregular; in one instance, when excited, he cut a pair of boots to pieces, because he could not get them on. He would tear his shirt to pieces while putting on his clothing. Whilst at my house he received a letter from his father; became very much excited; said his father wished to send a lady on for him to marry; that he wanted to leave the country, and stopped teaching at my house on that account. He seemed very much excited. I think the excitement was real. He left my house soon after the reception of the letter. These fits of excitement would come on occasionally; he would be excited for hours for a frivolous cause. I did not consider him capable of pursuing a chain of thought while such fits were on him."

Cross-examined.—Witness said : " I consider the defendant a man of very little common mind, and unbalanced. I consider defendant a highly educated man, and thought he would thus be of advantage to my children. Defendant was peaceable while at my house, as regards myself and family. Whilst there he never attempted violence on anybody. My greatest apprehension was that he would injure himself or some one else while under this excitement. I have witnessed in him fits of low spirits at times."

Mrs. Means testified in substance as follows: " That during the month of May, 1856, he was introduced to her at her house as a teacher. She employed him to act in the capacity of a private teacher for five months. He left before the term expired ; was absent for several months, and returned to her house as a teacher, during the month of May, 1857, where he remained until the latter part of June, 1858. During the year 1859, he visited her family frequently, and remained from three to six weeks at a visit. She thinks him to be of a quick and excitable temperament, and of a nervous disposition, and regards his mind as entirely unbalanced; the least excitement, at times, entirely unmanning him.

She knew this to be true, from the fact of his having lived in her family, and from many peculiar circumstances. She had frequently known him to be promenading her gallery, whilst her family were all quiet, about sunset or dark, talking to himself, and seeming to think he was fighting an army. He would frequently bring into her house great clubs and sticks of wood and throw them down. When asked for what purpose he brought them, he answered that he carried them for the purpose of fighting. He afterwards admitted to her that he had been out whipping the trees. He and his pupils were all friendly. She had seen him frequently while laboring under fits of derangement. She had known him often, while attempting to dress himself, tear his clothes into shreds, and rush down stairs from his room to present them to her for repairs. Frequently after hard reading, or a suggestion about religion or other familiar topics of the day, he would become perfectly excited; so much so that she would tell him not to talk any more. Sometimes he would regard what she would say to him; at others, would not, and turn off like a madman. Sometimes his fits of derangement, proceeding from frivolous causes, would last three or four days. She believes that he has but little or no reason while laboring under those fits of excitement or derangement. Generally, she believes him to be a man of no common sense. Witness states, that Joseph Zembrod occupied in her family the relation of private teacher and friend to the family, though she regarded him frequently as a deranged man, and manifested kindness to him as such. He on one occasion wanted the doctor sent for, and when the doctor came, he asked the minister to pray for him, which satisfied her that at that time he was without reason. During this severe attack he broke up her crockery ware in his room. She states that Joseph Zembrod never did, in her house, anything improper laboring under the influence of drink. She says: 'In fact, I have never seen him in my house the least under the influence of liquor.' "

The testimony of James E. Wallace is in the following words: "I am acquainted with Joseph Zembrod, the defendant; have known him since the fall of '56, in the parish of De Soto, at the residence of Col. Wm. B. Means. He was at that time employed

in teaching a private school in his family.  He (defendant) is
extremely nervous in his temperament; is very sensitive and
irritable in his disposition; has strong passions, a ready memory,
and very little discretion; is impulsive, and has rather weak rea-
soning powers; has no settled determination in any thing; is easy
led until his passions are aroused, when he is erratic and acts
strangely.  I think he possesses one of the most delicate mental
organizations I have ever met.  He lives without an object, and
acts with little or no order of purpose or design.  My means of know-
ing his mental peculiarities is from my having him in my employ-
ment as a teacher, during the fall of 1856, and the winter of '57, for
five months, and my subsequent acquaintance with him.  During
the fall of '56 and winter of '57, he slept with me, during which
time, I saw him manifest almost, (if) not quite, every faculty of
his mind.  I have seen the defendant laboring under intense men-
tal excitement, while teaching with me in the Mansfield Male
Academy.  At one time, during the fall of '56, his mental excite-
ment was so intense as to throw him into a spasm or fit, the
circumstances and causes of which were as follows: I was informed
by my patrons, sometime during the fall of 1856, that some of
the students were in the habit of bringing pistols and bowie
knives to school.  After lecturing the students in my room upon
the impropriety of such a course, I stept into the room of Mr.
Zembrod, near noon, for the purpose of lecturing the students in
his room also.  He was quite calm when I entered.  The moment
I spoke to the boys in regard to their having brought pistols to
school, Mr. Zembrod became intensly excited; made one or two
nervous flurries across the room, picked up his hat, and in a loud
voice, told the students they were a set of damned cowards, and
hurriedly left the room.  After lecturing the students, I repaired
to our boarding house.  I met defendant walking rapidly towards
town.  He was in an intense passion, and greatly agitated.  I
prevailed on him to return to our boarding house.  He talked
rapidly and incoherently.  He was nervous and tremulous; said
they were 'damned boors;' 'they were trying to kill him,' 'they
were a set of thugs.'  He could not sit still.  He started several
times for town.  I restrained him, and tried to reason with him,

but he seemed not to listen. He seemed to labor under the most excruciating mental torture; would strike his head with his fist; said 'he was ruined.' He ate no dinner, and did not teach that evening nor the next day. I found him at my room in bed on my return from school that evening. He complained of being sick; said he would be very sick; talked very incoherently. He became very angry with me without any apparent cause; used many severe epithets; often raised in his bed menacingly. I induced him to be quiet; told him I was his friend, and would do any thing I could for him. He soon went into a fit or spasm which lasted until nearly midnight. I was up and down with him much during the remainder of the night. I was very watchful of him. He would jump up suddenly; fly about the room in search of a candle or his clothes, none of which he could find. I would get up also, light a candle, and get him to bed again. In the morning, when he arose, he could not find his clothes; still seemed intensely excited. While attempting to put on a clean shirt, he found a button off, and tore the shirt into shreds. He afterwards selected another, which did not suit him, and he wadded it up and threw it aside; seemed inclined to vent his wrath upon any thing animate or inanimate. He seemed not to recollect much that transpired that night. I did not see him during the day following, but he seemed more calm that night. He seemed to revolt at the eccentricities of his own nature; said he would go mad. I often saw him greatly excited afterwards while teaching. He usually left the school when he became excited, very abruptly. Would become excited at the most trivial cause, and often manifested much anger. I have never seen the defendant, when I thought him devoid of reason, or insane, but once, which case I related in my answer to interrogatory third, above. At that time he seemed unconscious of his acts during the entire night and ensuing morning alluded to in my answer to third interrogatory. I have, however, on various other occasions, when he was excited, seen him do many things of which he was unconscious. I do not believe him a man of a well balanced mind. I think when he had the fit or spasm alluded to in answer third, that he was temporarily deranged, and did not know right from wrong, for at least

fifteen hours. ` He did not seem to be influenced by reason at this time; he did not seem influenced by sound judgment; he followed only the impulse of strong passions, intensely excited. He would accuse the negroes of stealing from him, and chastise them without cause; would frequently threaten to blow his brains out; and from his general conduct in the night when he had a fit, alluded to above, I felt much alarmed for his personal safety as well as my own. I was on the alert during the entire night. I had to treat him like a child. He would throw things about the room promiscuously. I think his keen perceptions and sensitiveness, coupled with strong passions and indiscretion, or want of judgment, was the cause of the frequent intense excitement which he manifested. He was never quiet for any length of time; the slightest disputation would inflame his passions. He would often, while alone with me in my room, become intensely angry at some imaginary insult; would accuse his liver of being the cause of his mental inquietude; would become excited and often angry with me when I did not enter into his silly and erratic notions; would hurriedly leave me. He was easily tantalized, and hence could not govern a school. I have often been compelled to take charge of his students when he would become excited about some trifling matter in school."

We think that the opinions of the four medical men, and the seven non-professional persons, the latter taken in connection with the facts on which they are founded, cannot fail to satisfy this court of the insanity of the accused, anterior to the homicide. If any thing remains for us to do, it is to add what we may in support of the position, taken by all the physicians, that the defendant was in an insane state when he committed the homicide. We must premise that the ability to distinguish right from wrong, long regarded in England as the test of sanity and legal accountability, has not been generally adopted in the United States. Taylor, in his Treatise on Medical Jurisprudence, p. 656, § 56, says: "Most lunatics have an abstract knowledge that right is right and wrong is wrong; but in true insanity, the voluntary power to control the thoughts and actions is impaired, limited, or overruled by insane motives. A lunatic may have the power of distin-

guishing right from wrong; but it is contended, from a close observation of the insane, that he has not the power of choosing right from wrong." "A criminal is punishable not merely because he has the power of distinguishing right from wrong, but because he voluntarily does the wrong, having the power to choose the right." In Greensmith's case there was no doubt the man knew he was doing wrong, and what was contrary to law; for, after having murdered two of his children, he returned and murdered the others, considering that he might as well suffer for all as for two. The case of Hadfield, who was tried for shooting at George III, and acquitted on the ground of insanity, furnishes another striking example of the existence of insane delusions, coupled with a knowledge of the consequences of the act which he was about to commit. He knew that in firing at the King he was doing what was contrary to law, and that the punishment of death was attached to the crime of assassination; but the motive for crime was, that he might be put to death by others—he would not take his own life.

Again. Martin, the incendiary, admitted that he knew he was doing wrong according to the law of man, when he set fire to York cathedral; he was conscious that the act was illegal, but he said he had the command of God to do it.

Thus, then, we find that a full consciousness of the illegality or wrongfulness of an act may exist in a man's mind at the time of its perpetration, and yet, in spite of this, he may be legally acquitted on the ground of insanity. Strangely enough, his acquittal will also meet with the countenance of those who maintain that an utter consciousness of right and wrong is a necessary part of the proof before the plea of insanity can be received, and that is the only safe test by which we can distinguish sanity from insanity, in the perpetration of crime. "The right and wrong test can never be rightly applied, because it rests in the conscience, which no human eye can penetrate." Whart. & Stil. Med. Jur. 46, sec. 60. "It is proper to notice, that in cases in which the defence is either insane impulse or insane delusion, the right and wrong test cannot be properly applied." Whart. Crim. Law, sec. 30; Bennett and Head's Leading Cases, 101. The author cites

cases in support of this position and concludes "that it certainly will not be maintained that a consciousness of the legal relations of crime confers responsibility where it does not otherwise exist.". Sec. 31.   Judge Story, with his usual tenderness, refused to allow the conviction of a young woman, who, in a fit of puerperal mania, threw her infant overboard, though she was perfectly conscious of the enormity of the act; and what this humane and very able judge did, in the teeth of the old dogmas, from the necessity of the case, the modern psychologists teach to be in accordance with experience and right reason.   W. & S., Med. Jurisprudence, sec. 58.

We will further premise that, "medical jurists have commonly treated insanity under four distinct forms—mania, monomania, dementia, and amentia, (idiocy.)   This division was proposed by Esquirol, and although of a purely artificial nature, it is highly convenient for the classification and arrangement of the facts connected with the subject.   In some instances there is great difficulty in assigning a particular case to either of these divisions, which is owing to the circumstance that these states of mind are frequently intermixed and are apt to pass and repass into each other; on other occasions a case may present characters which appertain to all the divisions."   Taylor's Med. Jurisprudence, 625.

Dr. Mackintosh says, "These different states may be variously mingled and modified into endless varieties of insanity as it is usually treated in books, and the symptoms may be still more diversified by the degree of excitement or depression which exists, together with the peculiarities of the constitution and the state of the patient's. health."   2 Mackintosh's Practice of. Physic, 159. Dr. Wood says : "The brain, if not a complex organ, certainly has complex functions, and it may be deranged in the whole of these functions, or in one only, or in any number of them, and there is scarcely an end to the diversity of mental disorders which may thus arise."   2 Wood's Prac. of Med., 688.   Dr. Winslow, in his treatise on insanity, page 12, says: "Insanity, as far as we have the means of perceiving, is a bodily disease ; in other words, its visible and invariable condition is a morbid action of the brain, either structural or functional.   A' definition of the effect in feel-

ing and manifestation of a diseased brain, which shall be suffi-
ciently comprehensive to include all the varieties of insane affection,
is scarcely to be looked for; yet definitions are constantly sought
after in courts of law, and the whole value of a witness's evidence
is often made to turn on its relation to a standard, which is in
itself the merest assumption. It would be a safer rule for courts
of law to direct their attention to the proof generally of diseased
manifestations of intellectual feelings, and when these are un-
doubted, to presume irresponsibility; because the contrary cannot
be made sure of, and the balance of probability is greatly on the
side of irresponsibility. If mercy is often extended to youth, to
seduction, even to great provocation, how much more ought it to
shelter diseases of the mind when clearly established."

Dr. Eberle divides the exciting causes of mental derangement
into the moral and physical, or into those which affect the animal
organization through the medium of the mind, and those which
act directly on the body. Of the former kind, he specifies among
other things, intense mental application on one subject, violent
rage, mortified pride, protracted mental depression. Among the
physical, he specifies blows or falls on the head. Eberle's Prac-
tice, 150–1–2.

Dr. Mackintosh says the exciting causes (to insanity), are what-
ever disorders the brain. Among these, he specifies intemperate
study, excitement of passion and blows on the head. Prac. of
Physic, 2 vol., 162–3.

We will next proceed to suggest to the court some of the symp-
toms or indicia of insanity, disclosed by the testimony in this case.
Tearing his clothes from his body, vide testimony of Lang, Ber-
cher, Taylor, Malhousen, Wallace and Mrs. Means. 2 Eberle's
Practice, 160. Want of modesty and delicacy, testimony of
Bercher and Mrs. Means. 2 Eb., 160. Walking to and fro with
rapidity; testimony of Bercher. Ib., 159. Irritability of tem-
per; testimony of Bercher, Lang, Wallace, Taylor, Dr. Sloan and
Mrs. Means. Ibid., 129. Dr. Wood, (Practice of Medicine, vol.
2., pp. 68–9 and 90,) specifies among others, the following symp-
toms of insanity. 1. Morbid excitability of feeling. 2. Irrita-

bility from slight causes. 3. Sleeplessness, restlessness, rising from the bed and walking about the chamber.

Whilst we would not attempt to assign Zembrod's insanity to any specific class, the court cannot but perceive that in its most aggravated form it was invariably accompanied by the impression, belief, hallucination, or illusion (we are at a loss to select the appropriate term,) that he was beset or pursued by enemies, seeking to destroy his life. In its more mitigated form, he sometimes imagined that he was fighting the battles of his country.

In the regular progress of our brief, we have now arrived at the point which we deem the only debatable one in the case; that is, was the accused insane at the time when he committed the homicide? In support of the affirmative, we have the positive testimony of the four physicians, corroborated by the testimony of Malhousen, Smith, Lester and Russell. From the statements of Malhousen and Lester, taken together, the homicide was committed in a very short time after accused forced open the door and quitted the room on the morning of the 13th of February. If he was insane during the night, it must be admitted that his insanity continued to that time. It will scarcely be insisted that we ought to show its existence down to the very moment when he shot deceased. In Hadfield's case, Lord Kenyon said, that would be "too great nicety." But we may be reminded that the previous question is, was accused insane at all during the night of the 12th of February? We shall inquire which of three hypotheses is the best sustained by the facts. 1. That he simulated insanity. 2. That he acted under the influence of passion, inflamed by drink. Or 3d. He was insane. The previous manifestations of insanity, evinced through a series of years, in different places, to different persons, American and German, male and female, when he had every conceivable motive for concealing the unsound state of his mind, would seem utterly to demolish the first hypothesis; besides, if he had been playing that role, he would scarcely have played it all night in his own room, to a friend, and laid it aside in the morning as soon as he fell into the hands of a law officer. Theory No. 2 is no better supported. There is no evidence that he was an habitual drunkard; none that

he was in a state of intoxication that night. McFall says that he and deceased, in about an hour and a half, drank about five drinks of brandy or whiskey. During the time they were drinking they were also eating : that he thinks accused was excited by what he drank. He was perfectly cool himself; though he had drank several times during the day. Henrich says accused was not drunk; was a little excited from conversation. Malhousen and Smith did not think him under the influence of drink, and being intimate acquaintances, they were competent judges. But suppose he was under alcoholic excitement at the time (10 o'clock) they left Henrich's, it certainly would have subsided, and a reaction have taken place before the dawn of next morning.

The wildness of his look, his forgetfulness of his room-mate's name, his murmured and incoherent soliloquy, his restlessness and frequent gettings up and going to the window, his running about the room as if pursued, his running about in the morning to find his clothes, his exclamation, "they are after me, they will kill me, I will be a murderer," his breaking open the door, are scarcely the legitimate results of five drinks of liquor. Indeed they would not manifest themselves in a person simply intoxicated. But it may be urged that they helped to excite his passion. The physical excitement produced by the liquor, must have subsided long before the next morning. The angry feelings produced by the quarrel and fight with Dellardt, must have subsided equally soon, into ill will, hatred, or vindictive feelings. But to the witnesses Malhousen and Smith, (and the former must have seen him very soon after his rencontre with deceased,) he did not appear to be under the influence either of liquor or anger. Had the latter alone, or inflamed by the former, been the dominant influence operating on his mind, would it not have been manifested by his uttering curses both loud and deep against Dellardt? Yet neither of them heard him even mention the name of deceased, or allude to any difficulty he had with any one. He had many hours to meditate upon a plan of destroying Dellardt. Grant that he devoted the night to the concoction of such a plan. Did he associate with it any plan for his own escape? So far from it, he had not one word to say in extenuation of the enormity of his crime. His greatest

desire seemed to be to find an officer of the law into whose hands to surrender himself. Was this rational, or was it not inconsistent with what is admitted in all ages and nations to be the law paramount of our natures, the love of life, the desire of self-preservation? Dr. Winslow says, "The subsequent conduct of the unfortunate individual is generally characteristic of his state. He seeks no escape or flight; delivers himself up to justice; acknowledges the crime laid to his charge; describes the state of his mind which led to its perpetration, or remains stupefied or overcome by a horrible consciousness of having been the agent in an atrocious deed."

Then the accused was insane to and after the time of the killing. But we are to be thrown back upon the simulating hypothesis, by the only gleam of seeming rationality which exhibited itself in his conduct from 10 o'clock at night, until after (how long we know not) the killing. This scintillation, which is to demolish the overwhelming evidence of his insanity, presented us, is, that he was actuated by a motive. We have seen from medical jurisconsults, that attempts at classifying the diseases of the mind, (however persisted in by courts,) must always fail; that they are constantly passing from one form into another, and that a particular case of insanity may present symptoms pertaining to various forms. We have not attempted, nor shall we attempt to assign Zembrod's case to any recognized specific form of insanity. We feel wholly incapable of presenting a diagnosis of his mental disorder. We might say, that its various manifestations present Protean shapes, chameleon hues. We might hazard the conjecture, that during the night of the 12th, and the morning of the 13th February, his case presented *indicia* of *monomania*, and homicidal *mania*. Other forms may have been intermingled with these. Who can tell the secret workings of an insane mind? His exclamation, "They are after me, they will kill me!" may have referred to the myrmidons of Austria, the oppressors of his native land.

His exclamation "I will be a murderer," (seemingly wrung from the agony of his soul,) clearly indicates that although he may have had a perception of the atrocious character of the act he was about to perpetrate, he had lost all power of choosing or refusing. But the books furnish numerous cases, where the person laboring

35Y

under mental derangement, not only had a vindictive purpose, but exhibited most consummate art in carrying his designs into execution.  Dr. Taylor says that "lunatics, confined in a lunatic asylum, have been known to be influenced by motives in the perpetration of crimes.  Thus they have often murdered their keepers, in revenge for ill treatment, which they have experienced at their hands."  (See the case of the Queen v. Farmer, York Spring Assizes, 183.)  This man was acquitted as insane, while the clear motive for the homicide was revenge and ill feeling.  In another case, the act of murder was perpetrated from jealousy.  (Reg. v. Goule, Durham Summer Assizes, 1845.  Taylor's Med. Jour., 658, under the head, "Motive for Crime.")

Rebecca Hodge was tried at Warwick, Lent Assizes, for feloniously shooting at and wounding William Birch.  Prisoner had lived with Birch from February until August, about seven years before the homicide, and the reason she went away was, that she went one Saturday to fetch a pail of water, and did not come back until Monday, and when she returned, Birch would not take her into his service again.  Upon being asked the question how she could account for taking the life of Mr. Birch, "did he ever behave ill to her?" she said no, never.  She then said she lived with Mr. Birch about seven years ago.  The first part of the time he made love to her, but in consequence of her absconding, her master ordered Miss Bradbury to discharge her.  From that period she vowed to be revenged.  She said she had moulded the bullets herself, and rounded them with a knife, and described minutely her proceedings in carrying out her purpose and effecting her escape.  On Miss Bradbury and Mr. Birch being asked the question, they both said, they never perceived in her any symptoms of derangement.  Francis Woodcock, magistrate, and Mary Tupper, the prisoner's sister, gave evidence tending to show that she was at times deranged.  The former said the "impression upon him was that she was not of right mind."  The latter said "she believed that at times she was insane."  His Lordship then addressed the jury.  He went through the whole of the evidence, commenting upon it at considerable length.  His Lordship, from his observations, seemed inclined to believe that the evidence was strong

enough to prove that the prisoner was, at times, not in her right mind, and he concluded with observing to the jury, that if they had any doubt, it would be proper for them to let that doubt operate in favor of the prisoner. The jury instantly returned a verdict of "not guilty," on the ground of insanity. (Winslow on Insanity, p. 15, vide also p. 14.)

David Paul Brown, in his work entitled "The Forum," (vol 2, p. 477,) under the head "Reason and Method in Madness," cites the following case : "Willie Williams, a gentleman from the South, had been about a year in the Blackley Asylum. Having made his escape, he wrote to counsel, wishing to know what legal redress could be obtained for his ruined prospects, etc. In his letter he thus reasons: "If I cannot obtain redress, I will shoot Dr. Kirkbride for having imprisoned me, and should I be tried for murder, my defence will be this: 'If I am mad, as you say, I cannot commit an offence ; if I am not mad, you deserve death for having deprived me of liberty and blighted my hopes.' " Not receiving an answer, he carried out his threats. He perched himself upon a tree, in the garden of the asylum, and, as Dr. Kirkbride passed, shot him from behind; but happily, the contents of the gun lodged chiefly in the rim of the Doctor's hat, and the result was comparatively harmless. Williams was afterwards tried for assault and battery, with intent to kill, but his insanity being established, he was acquitted."

Dr. Taylor on this subject, says : "Much stress was formerly laid upon the delusion being connected with the act, in cases of insanity. But it must be remembered, that, except by the confessions of insane persons, during convalescence, it is not common for a sane mind to connect their most simple acts with the delusions under which they labor. Every act of homicide perpetrated by a really insane person, is doubtless connected with some delusion with which he is affected, but it by no means follows that one who is sane should always be able to make out this connection, and it would therefore be unjust to rest the irresponsibility of the accused upon an accidental discovery of this kind." Lord Eldon, on a question of insanity, cites Shakespeare's King Lear. (Lives of the Lord Chancellors, vol. 2, p. 249, London Ed.) We may

Adair v. Cooper.

therefore be excused for alluding, in conclusion, to the fact that it is a vexed question with the dramatic critics, whether that greatest of all portrayers of the human mind that ever lived in the tide of time, meant to represent the Prince of Denmark, after his interview with his father's ghost, as insane, or feigning insanity, the better to enable him to revenge his father's murder.

ROBERTS, J.—The appellant may be guilty of a capital offence as charged. The testimony of the witnesses upon the subject of his insanity, as presented in the record before us, is of a character to induce the belief that it is not a case in which the " proof is evident or presumption great." (O. & W. Dig., 14; Carter v. The State, 12 Tex. R., 504; Com. v. Rogers, 7 Metcalf, Shaw C. J. Leading Crim. Cases, B. & H., 1 vol., 87, and notes of English and American cases.) Therefore it is determined that he is entitled to bail.

                                                    Bail allowed.