## W. H. McCLACKEY v. THE STATE.

1. EVIDENCE — INSANITY. — Insanity being a legal defence, testimony bearing upon the mental condition of the accused at the time of the alleged offence should be admitted in evidence. And not only professional or expert witnesses, but non-professional witnesses, will be permitted to give their opinions on this question, together with the facts and circumstances upon which their opinions are founded.

2. INDICTMENT. — It is urged by appellant that the indictment is defective because it does not show that the grand jury was empanelled in the State of Texas; because in the charging clause it does not connect the pistol and the appellant by the use of the word "with;" and because it alleges that the "leaden balls were shot off," instead of the pistol. These objections are not well taken. The material allegations are sufficient to sustain the indictment.

APPEAL from the District Court of Hood. Tried below before the Hon. J. R. FLEMING.

Seven years' confinement in the penitentiary was assessed against appellant for the murder of Samuel Hunter, in Hood County, Texas, on May 25, 1875. The evidence upon which he was convicted being almost entirely circumstantial, a brief synopsis of the most pertinent is given below.

The State, by the witness Pinson, showed that at the time of the killing, appellant lived in Hood County, on the north side of the Brazos River, as it then ran; that the

deceased lived in what was known as De Cordova's Bend, on the west side of the river; and that in going from the deceased's neighborhood to one Matlock's, one would naturally travel the road leading by the house of the appellant. The distance from the house of deceased to that of the appellant is about one mile. Mr. Matlock lived some three or four hundred yards from the appellant, in an opposite direction from deceased's house, the road running near the appellant's front gate. There was another road going around next to the river, but the road spoken of is the most generally travelled, and both are neighborhood roads.

The day after the killing, witness saw the body of deceased, dressed and laid out at the house of appellant. The house fronted rather to the south, and the gate stood some eight or ten steps from the door, and the wagon-track of the road was some twenty steps from the gate. Witness noticed several bullet-marks on the bush, near the road. The ground between the larger part of the front fence and the road was open, but there was a small bunch of live-oaks to the left of the gate, going out. The ground on each side of the enclosure south of the road was bushy, and there was a ravine near the south-east and south-west corners of the lot, and running from the south-west corner towards Matlock's. This was densely wooded by a thicket. There is a live-oak sapling standing south-east, and on the other side of the road from this thicket. Witness noticed two bullet-marks in this sapling, about six feet from the ground; and a line drawn from these marks would miss the gate spoken of, and enter the thicket on the south-west corner of the lot, towards Matlock's.

About a month after the killing, and while the appellant was out on bond,— not under arrest,— he was with witness in the harvest field, and got to speaking of his troubles; among them his troubles with Hunter, the deceased. A remark appellant made drew from witness the remark that

he thought appellant, a few days before the killing, went to deceased's house and talked over the difficulty, spending most of the day, making friends, and afterwards expressing as much esteem for deceased as any acquaintance appellant had ; to which the appellant responded, " That's so." Witness further remarked that he had also learned that from that time appellant had not seen deceased until the day of the killing ; to which also appellant responded, " That's so." Witness then said appellant had done " mighty wrong ; " to which he responded that deceased's " life has been stolen away from him."

Witness and appellant then went up to witness's house for a pistol-scabbard for which appellant had come, and on asking him whose scabbard it was, the appellant answered that it " belonged to Smith." Witness knew of no man living in the neighborhood named Smith. Appellant put the scabbard on his belt, and in it put his pistol, which he was wearing. It was a new scabbard, and the one appellant had used before was a worn-out one. On the day of the funeral, — after it was over, — witness came by appellant's, and his wife put the clothes of deceased in witness's wagon, to be taken to the family of deceased. Among them was found the scabbard, which, not being claimed as deceased's, was carried back to witness's house.

State's witness Carmichael testified that he arrived on the ground late in the evening that the deceased was killed. He went there by Matlock's house, and there found appellant with a bullet-wound in one arm. When he got to appellant's house, he found deceased lying on his face, dead, near a small clump of bushes. His head was lying towards appellant's house, and he had his pistol grasped in both hands, full-cocked, with his forefinger on the trigger, pointing towards the house of appellant, with the barrel resting on a twig of a small bush that had been some time cut down. As one of the jury of inquest, witness found

several wounds on the body of deceased, — one, evidently made by a pistol-ball, in the side, one of a pistol-ball in the hip, and several in the thigh, evidently made by smaller shot than the other two. These wounds were all on the left side. The body was found at a small clump of bushes east of the gate, and opposite from Matlock's house, and near the south-east corner of the fence. The witness then describes the ground, etc., as the witness Pinson; as, indeed, do all the witnesses. Proceeding, the witness says he examined the ground around, and found the tracks of deceased's horse regular, as though in a walk, until it got opposite or in front of the house, where it showed that the horse had made a sudden spring, plowing the ground with his hoofs and "cutting up" a great deal, and showed to have kept up several yards, to near where deceased's body was found. An examination showed one barrel of deceased's pistol discharged; the others were charged, and the caps were bright. The bullet-marks in the sapling were fresh, and in a line from the thicket. Witness also noticed bullet-marks on bushes near the ground, the splinters on which pointed to the ravine in a south-western direction, towards the thicket. Witness found a breech-loading carbine tied to the saddle of the deceased, in which were all the cartridges. Also found with the saddle a pair of saddle-bags, in which were one six-shooter and one, perhaps two, derringers, all loaded.

Martin Matlock, for the State, swears that he and his brother Jesse were at work in the field of his father, some 300 or 400 yards from the house of the appellant, on the evening in question. About two hours by sun, deceased came into the field on horseback, having his gun strapped to his saddle, and in the course of conversation said that he had just ridden past the house of appellant. From where they were, deceased's nearest way home would have been eastward, and by the house of appellant. He left the wit-

ness and brother shortly; and in a few minutes, about long enough for him to have reached the house of appellant, witness heard six shots, the first louder and more distinct than the others. Soon afterwards the horn blew at witness's house, and on going up he found the appellant there with a wound in his arm. Witness then learned that deceased had been killed. While saddling his horse to go for a justice of the peace, witness noticed one Rash holding the same horse deceased was riding in the field. The horse was wounded in the left flank. Just before witness started, the appellant said that the deceased had charged him (appellant) at his gate, and he (appellant) had shot deceased, and had been shot by deceased. Witness states that on the Sunday before the killing, appellant passed the house of witness with a pistol, which he said one Brown had furnished him; and two or three days before the killing, appellant proposed to witness and his brother Jesse to exchange some large shot, about the size of pistol-balls, for smaller; did not have them to exchange. When deceased left witness in the field, he said he was going home. In doing so, his left side would be presented to the house of appellant.

The testimony of Jesse Matlock is the same as that of his brother, except that he went to the body on hearing of the killing, and found it as it was described by Carmichael, — holding the pistol, etc. When proposing to swap shot, appellant did not say he wanted the smaller shot to shoot crows with.

W. M. Rash testified to being the first, with his brother, S. A. Rash, to reach the ground after the killing. He found the body as described by Carmichael and the Matlocks, in regard to the position of the body, the pistol, the ground, etc.

The testimony of Martin and Barnard is immaterial, except that, passing appellant's house about two hours before the shooting, they saw the horse of one John Tingley hitched

to some brush about fifty yards from the house, and another horse, in plow gear, standing in appellant's enclosure. Shortly afterwards, returning the same way, they heard shooting, — as many as six reports, — the first loudest, and heard some one exclaim, Oh! Lord! Oh! Lord! repeating from the time of the second shot to the fourth. Afterwards two other reports were heard by witness.

H. Howard, for the State, testified that he heard appellant talking to one Brown, in the store of McCarty & Brown, in Acton, Hood County, Texas, on the Saturday morning before the killing. Appellant was excited, and said that deceased had accused him (the appellant), Tingley, and Ledbetter of knowing where his (deceased's) stolen horses were, and that deceased went desperately armed; to which Brown responded that if a " fight is what he wants, we have got as good arms as he has."

Witness Holt saw the appellant loading his large-bored double-barrelled shot-gun, at Rash's, on the Tuesday before the killing. To appellant's question of " How much powder do you put in to kill an old buck?" witness replied, "A little more than you have in your hand;" and at his (appellant's) request, directed him also as to the amount of buckshot to put in for the same purpose. Did not stay to see appellant put shot in.

The testimony of William Matlock corroborates the others as to the position of the body, the ground, and wounds; and adds that, on the morning after the killing, appellant told him that the scalp-wounds on deceased's head were inflicted by him (appellant) with the ramrod part of his pistol.

S. A. Rash, for the appellant, corroborates the State's witnesses as to position of the body when found, etc., and adds that he had heard deceased threaten that if appellant came over into De Cordova Bend, where he (deceased) lived, to cultivate land, he (deceased) would tie appellant up, whip

him, and cut his throat from ear to ear; and further, that deceased had said that he intended to build a church in the Bend, and that if appellant ever came over there to preach, he (deceased) would quirt the appellant until he would dance in the sand. Witness told appellant that if a man meant anything by what he said, he (appellant) had better watch deceased. Witness said that on approaching the subject of making peace between the two, he once told the deceased that appellant did not want to do him (deceased) any harm, and that appellant had once said he (appellant) would rather pray for him (deceased) than to hurt him; to which deceased responded, "Yes, G—d d—n him, he has never had a bullet put right there yet," and pointing to his forehead. Witness never told appellant what deceased said about him (appellant), and never heard deceased make any direct threat to kill appellant, nor did witness ever tell appellant of any.

Tingley, for the defence, said that on the day of the killing he was on his way to his father-in-law's, across the river, and as he neared the house of appellant he met appellant coming from his field, and went with appellant into his (appellant's) house, and took a seat. Shortly appellant got up and went out in front, and in a few minutes witness heard talking, but did not distinguish what was said. He then heard a shot, and heard appellant exclaim, "I am shot." Witness jumped up and ran out and away. Going out, he saw deceased on his horse, trying to get his gun loose. Saw appellant with blood on his arm. Did not see appellant have any arms at the time. Thinks deceased shot appellant.

On cross-examination: The witness does not remember whether he hitched his horse to bushes or the fence. Appellant had a double-barrelled shot-gun when he met him going to the house from the field, which he put down outside the fence. Don't remember on which side of the gate.

W. B. Glenn, for appellant, stated that on Monday or Tuesday before the killing he was riding along the road with deceased, and talking with him. Deceased was cursing and abusing Tingley, appellant, and others, but chiefly appellant, whom he said that he (deceased) intended to whip, if he (deceased) ever caught him over in the Bend. Deceased said, further, that appellant had never had a bullet put in his forehead, and never would have, as he (appellant) was too d—d a coward. When witness usually saw deceased, he was generally armed. Never told appellant of these things, and never heard any direct threats from deceased. Considers that deceased was a brave man, with a little backing, and quick to resent an insult.

Witnesses W. B. Glenn, E. Y. Brown, Carmichael, H. Wilson, and S. A. Rash testified that appellant's reputation was that of a peaceable and quiet man, and that of deceased as violent and dangerous, and generally armed when seen by witnesses.

During the trial the defence offered to prove by E. Y. Brown that he had known the appellant since June, 1873, and considered him crazy, basing this opinion on the general conduct and dealings of the appellant, who would forget his promises, and when reminded of them, would seem as if in a dream. The counsel for the State objected to this testimony, on the ground that the witness was not sufficiently acquainted with the habits and character of the appellant to give an intelligent opinion, and because the witness stated conclusions, and not facts, as the basis of his opinion. The court sustained the objection, and excluded the testimony; to which ruling the defence excepted at the time, and afterwards assigned the ruling as one of the causes in the motion for a new trial.

J. S. Wood, for the appellant.

*George McCormick*, Assistant Attorney-General, for the State.

*Thomas W. Dodd*, also for the State. The evidence of Brown was an attempt to establish insanity, etc.

We submit that the reasons given by the court below in certifying the exception are well sustained by the best established rules of evidence; and that the ruling of the court was not error, for the further reason that the evidence ruled out did not even tend to relate to the condition of the mind of appellant at the time of the commission of the offence; and, moreover, only tends, to give it the most liberal construction, to show that appellant was a man of rather a weak mind, a bad memory, etc. In no sense were the reasons or conclusions of the witness based upon such facts, within his knowledge, as would have justified the court in submitting the issue of insanity to the jury.

WINKLER, J. It is shown by a bill of exceptions that on the trial below, the appellant, under the plea of not guilty, attempted to prove that at the time of the alleged perpetration of the crime for which he was then being tried he was insane, or, as expressed by the witness, *crazy, or not sound in mind;* and that after a witness had been examined on the subject, and as to his means of information, the testimony, on motion of the district attorney, was by the court excluded from the jury, on the ground, as stated in the bill of exceptions, " that the witness was not sufficiently acquainted with the habits and character of the accused to give an intelligent opinion ; and, also, because the witness could not state any facts upon which his opinion was based, but only stated conclusions."

We are of opinion that it was error to exclude this evidence from the jury. Instead of pursuing this course, the

testimony should have been admitted, to be considered by and passed upon by the jury, under a proper instruction by the court.

It is provided by the Penal Code (art. 41) that no act done in a state of insanity can be punished as an offence. Pasc. Dig., art. 1643. And by the Code of Criminal Procedure (art. 497) it is provided that, under the plea of " not guilty," *evidence to establish the insanity of the defendant may be introduced.* This being a recognized matter of defence, whatever of evidence was offered on the question of insanity should have gone to the jury under the plea of " not guilty," together with the other facts which tended to acquit him of the accusation. Pasc. Dig., art. 2965.

The jury are the exclusive judges of the facts in every criminal case. Code Cr. Proc., art. 593. It is within the legitimate scope of the power of the judge to decide whether testimony offered is competent, and therefore admissible, or not; but if the testimony be admissible under the law and the pleadings, its effect upon the issue, together with its sufficiency, in order to establish the proposition for which it is offered, is properly for the consideration of the jury, and not the court.

Whilst the general rule is that witnesses must state facts, and not conclusions merely, it is well settled that on the question of insanity the general rule does not apply. On the contrary, it is now well settled in Texas, and in most of the other States of the United States, that on this question even non-professional witnesses may not only state facts tending to prove insanity, but may also express their opinions and conclusions upon the facts to which they testify; and the courts are not permitted to even discuss the facts in the charge to the jury. Code Cr. Proc. 595.

In *Thomas* v. *The State*, 40 Texas, 60, the court below refused to permit the witnesses to state to the jury their opinions of the defendant's mental capacity at the date

of the alleged offence, and the witnesses were asked to state if they were acquainted with the mental *status* of the defendant, and their opportunity for such acquaintance. The court below ruled that the witnesses might state the facts and circumstances upon which their opinions were based, but not their opinions or belief; and on this subject the Supreme Court held as follows :

" We think the witnesses should be allowed to give their opinions, together with the facts on which their opinions were based, when it appears that their acquaintance with the party will enable them to form correct opinions of his mental condition." The learned judge, after discussing at some length the exceptions to the general rules of evidence, and the qualifications of those general rules, and giving examples of the qualifications, proceeds as follows : " The analogy in the investigation of these questions, and other questions, when direct evidence is not attainable, has been applied to inquiries respecting the condition of a party as sane or insane, and the opinions of non-professional witnesses, together with the facts on which their opinions are founded, have been admitted in evidence." See the case, and the authorities cited. In the case of Thomas, it was also held that the opinion was not in conflict with *Gherke* v. *The State*, 13 Texas, 568.

In a late case (*Holcomb* v. *The State*, 41 Texas, 125) the proposition decided and the conclusions arrived at appear from the following extract from the opinion of the Court : " The court refused to permit the witnesses to testify to conduct of the defendant tending to show his mental deficiency, and who, for the length of time they had known the defendant, would appear to have had good opportunity of forming an opinion, to give their conclusions or opinions as to his mental soundness. In this we think there was error. The law is believed to be well settled that non-professional witnesses should be allowed to state their opinions as to the

sanity of a party, as the result of their observations, accompanied with a statement of the facts observed;" citing 1 Greenl. on Ev., sec. 440, and Bishop's Cr. Proc. 676–680. See also *Stevens* v. *The State*, 31 Blackf. 486, and authorities there cited ; *Guaguando* v. *The State*, 25 Texas, 519.

It may be that, from some expressions to be found in the cases of Thomas and Holcomb, the court below might have understood that, on the question of sanity or insanity, it was within the province of the court to determine, upon the extent of the acquaintance and the sufficiency of the means of information, as to the facts stated upon which the conclusions of the witness were based, and to determine upon the admissibility of the evidence, and to admit it or exclude it, according as the facts should appear, as developed on the examination of the witness. If so, we are of the opinion that the conclusion was erroneous. The question of insanity being a recognized defence, whatever of legitimate evidence was offered, it should have gone to the jury.

The main question determined by these cases, as we understand them, is that, on the question of the sanity or insanity of the party accused, not only experts, but non-professional witnesses, may state their conclusions, from the facts within their knowledge, as to the mental condition of the party ; and that whether the means of information, or facts proved, or the conclusions drawn by the witness are of the satisfactory character required to base a finding upon, or not, is for the consideration of the jury, under proper instructions.

We are of opinion the court erred in excluding the testimony. And in view of the fact that the testimony, as shown by the record, was almost entirely circumstantial, the error was of sufficient materiality to warrant the reversal of the judgment.

We are of opinion that the objections urged against the sufficiency of the indictment are not well taken. They

amount to about this : that an unimportant omission or mistake in an immaterial part of the indictment was made, either by the writer, or by the clerk in copying it into the transcript. The material parts of the indictment are deemed to be sufficient, and the court did not err in overruling the motion in arrest of judgment. Other errors are assigned which have not been considered, for the reasons that some of them are deemed of little moment, and others are not likely to arise on a subsequent trial. For the error above pointed out, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*